UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                      Plaintiff,<br><br>                v.<br><br>HECTOR VARGAS,<br><br>                      Defendant. | Case No. 1:21-cr-00047-RDM |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

      Defendant Hector Vargas respectfully submits this Memorandum in Aid of Sentencing. A jury convicted Defendant on four misdemeanor counts: entering and remaining in the United States Capitol without lawful authorization (Count 1, 18 U.S.C. § 1752(a)(1)); disorderly and disruptive conduct in the Capitol Building (Count 2, 18 U.S.C. § 1752(a)(2)); disorderly conduct in the Capitol Building (Count 3, 40 U.S.C. § 5104(e)(2)(D)); and parading, demonstrating, or picketing in the Capitol Building (Count 4, 40 U.S.C. § 5104(e)(2)(G)).

      Hector Vargas is a young man who has struggled to put his life on track since serving in the U.S. Marine Corps. His efforts to further his education thwarted by the COVID-19 pandemic, he became homeless, and has only recently found gainful employment as a truck driver. A sentence that prevented him from working would jeopardize the fragile start he has made toward becoming a contributing and productive member of society. Therefore, Mr. Vargas respectfully submits that the appropriate punishment for his offenses is a term of probation.

I.

FACTS

A.  Hector Vargas' History and Characteristics

Hector Vargas was born in 1993 in Caguas, Puerto Rico.  His parents never married, and their relationship ended after Hector was born.  Mr. Vargas was 8 years old and living with his mother, Nagdalis Santos, when his father, Hector Vargas, Sr. was killed in an automobile accident in 2001.   Mr. Vargas is estranged from his mother because of religious and political differences.  He also has no contact with his three sisters.

Mr. Vargas lived in Puerto Rico until he was 17 years old.  He graduated from Caguas Vocational High School in 2010.  He then studied mechanical engineering at the Polytechnic University of Puerto Rico, but left to join the  United States Marine Corps and was sent to Paris Island, South Carolina for basic training. He was deployed to Bahrain, Japan, and South Korea, and received a Certificate of Merit, as well as awards for the Global War on Terrorism and Service Deployment.   Mr. Vargas is a service-connected disabled veteran, who suffers from Post-Traumatic Stress Disorder (PTSD), and has received counseling through the Veteran's Administration.

In 2017-18, after his honorable discharge from the Marines, Mr. Vargas completed a film and acting program at the New York Film Academy where he earned a certificate. From 2018-2020, he studied Business Administration at the Borough of Manhattan Community College, but did not complete the program due to the COVID-19 pandemic.

When he left the community college during the pandemic, Mr. Vargas had great difficulty finding employment, and after his arrest in 2021, he lived for some time in a shelter for homeless veterans.  When he became employed in October 2022, driving a box truck delivering packages, he began sleeping in his truck.  In January 2023, he began renting a

2

room in a home shared with three other people, but because his job keeps him on the road most days, he still often sleeps in this truck.

Mr. Vargas has a two-year-old daughter, Abigail Palafox, who lives with her mother in New Jersey. Mr. Vargas has no visitation rights, and is not in contact with the child or her mother. However, he is required to pay $500 per month in child support.

## B. The Nature and Circumstances of the Offense

On January 6, 2021, thousands of Americans illegally entered the grounds of the United States Capitol. At least 1,000 of them have been arrested and charged with various crimes, including very serious crimes. United States Department of Justice, *26 Months Since the Attack on the Capitol* (Mar. 6, 2023), available at https://www.justice.gov/usao-dc/26-months-jan-6-attack-capitol ("*26 Months Since the Attack on the Capitol*"). Some, alleged to have "concocted a plan for an armed rebellion to shatter a bedrock of American democracy," have been charged with (and convicted of) seditious conspiracy. *See* Carrie Johnson, *Oath Keepers planned an armed rebellion, prosecutor tells jury in sedition case,* NPR (Oct. 3, 2022), available at https://www.npr.org/2022/10/03/1126576420/oath-keepers-seditious-conspiracy-jan-6-trial-opening-statements. These individuals and groups planned and prepared for an insurrection, and "deliberately harnessed the mob's anger to overrun the Capitol." *Final Report*, Select Committee to Investigate the January 6th Attack on the United States Capitol, House Report 117-663 at 638-39 (December 22, 2022) ("the January 6th Committee Report"), available at https://www.govinfo.gov/content/pkg/GPO-J6-REPORT/pdf/GPO-J6-REPORT.pdfww.newsweek.com/what-donald-trump-said-election-victory-speech-full-transcript-1544716.

Others, however – like Hector Vargas – came to Washington, DC that day with no plan to go near the Capitol, and no plan to interfere with Congress. They came in response to a

direct invitation from the then-President who, since Election Night 2020, had repeatedly told them that the results of that election were "a fraud on the American public." January 6th Committee Report at 195; *see also Rudy Giuliani Trump Campaign Press Conference Transcript November 19: Election Fraud Claims,* Rev (Nov 20, 2020), available at https://www.rev.com/blog/transcripts/rudy-giuliani-trump-campaign-press-conference-transcript-november-19-election-fraud-claims (assertions *by* Trump campaign attorneys that there was "direct evidence" of fraud, that software used to tabulate votes could "set and run an algorithm" to "flip votes, and that the election had been "absolutely corrupt" and "irredeemably compromised") *Id.*

On November 29, 2020, an official in the office of Georgia's Secretary State implored then-President Trump:

> Stop inspiring people to commit potential acts of violence. Someone is going to get hurt, someone is going to get shot, someone is going to get killed.

Richard Fausset, *'It Has to Stop': Georgia Election Official Lashes Trump,* The New York Times (Dec. 1, 2020), available at https://www.nytimes.com/2020/12/01/us/politics /georgia-election-trump.html.  But instead, on December 19, 2020, then-President Trump goaded his supporters to attend a "[b]ig protest in D.C. on January 6th," exhorting them, "[b]e there, will be wild!"  Dan Berry and Sheera Frenkel, *'Be There. Will Be Wild!': Trump All but Circled the Date,* The New York Times (Jan. 6, 2021), available at https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html.

Hector Vargas came to Washington, DC on January 6, 2021, to show his support for then-President Trump by attending the "Stop the Steal" rally held near the White House.  He had no plan to go near the Capitol until the president exhorted the crowd to "march[] over to the Capitol" to "confront this egregious assault on our democracy." Brian Naylor, *Read*

4

*Trump's Jan. 6 Speech, A Key Part of Impeachment Trial,* NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.  Then-President Trump indicated he would meet people at the Capitol, and Mr. Vargas left the rally at the Ellipse, traveling to the Capitol, where he expected it to continue.  As the evidence showed, he had no other plan, and once he arrived at the Capitol, he remained outside for over two hours before approaching an entrance.

The Department of Justice estimates that of the many thousands of individuals at the Capitol that day, between 2000 and 2500 entered the Capitol Building itself.  Ryan Lucas, *Where the Jan. 6 insurrection investigation stands, one year later,* NPR (Jan. 6, 2022), available at https://www.npr.org/2022/01/06/1070736018/jan-6-anniversary-investigation-cases-defendants-justice.   More than 300 of them have been charged with assaulting, resisting, or impeding law enforcement officers, including more than 100 who have been charged with using a deadly or dangerous weapon or causing serious bodily injury to an officer.  *26 Months Since the Attack on the Capitol*, *supra*.  Dozens have been charged with destruction or theft of government property.  *Id.*  Others, including Hector Vargas, engaged in no such conduct.  To be sure, their presence in the Capitol Building was unauthorized, and improper.  But whatever anyone else did on January 6, 2021, Hector Vargas' offense was simply being present.

Mr. Vargas' entry into the Capitol Building, and his actions inside, are well documented in the video evidence produced at trial.  At approximately 2.50 p.m., he texted that he was "about to go in" to the building, but as the video shows, when he arrived at the building's door, he did not follow the crowd pouring in, but stopped when he saw law enforcement officers attempting to bar entry.  Then, he moved out of the doorway and behind one of the doors, where he remained until the crowd surged in, pushing him in as he grasped the door

5

in an effort to avoid being swept in.  Once in, he moved with the crowd into the Rotunda, where he followed the instructions of police to stand in a particular place and then to leave the building.  All told, he remained in the building for approximately 7 minutes, and while inside, he did nothing to impede or harm anyone else, touched nothing, and took nothing.

## II.

## ARGUMENT

The starting point of any federal sentencing proceeding is "correctly calculating the applicable Guidelines range[,] which serves as the "initial benchmark" in determining an appropriate sentence.  *United States v. Abukhatallah*, 41 F.4th 608, 643 (D.C. Cir. 2022).  However, the Guidelines are not mandatory, and the Court "may not presume that the Guidelines range is reasonable," but "must make an individualized assessment based on the facts presented." *Id.* at 644.  Ultimately, the Court must impose a sentence "sufficient, but not greater than necessary," to comply with the following purposes:

(A) to reflect the seriousness of the crime, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a).   Mr. Vargas respectfully submits that here, that sentence is a term of probation.

A.  **Application of the United States Sentencing Guidelines**

Counts 3 and 4, are Class B misdemeanors, 18 U.S.C. §3559(a)(7), to which the Sentencing Guidelines do not apply.  U.S.S.G. §1B1.9.  Therefore, the Court's sentencing discretion on these counts is unaffected by the Guidelines.

For the reasons stated in Defendant's Objections to Draft Presentence Investigation Report (March 3, 2023) [ECF NO. 78] – which are incorporated herein – the Guideline calculations proposed by the government and the Probation Office (proposing a total offense level of 15) – are incorrect.  The correct total offense level for Counts 1 and 2 is 4.  In Mr. Vargas' Criminal History Category (I), the applicable Guidelines Range is 0-6 months' imprisonment, and a sentence of probation is available.  U.S.S.G. §5B1.1(a)(1)

B.  **A Sentence of Probation is "Sufficient, but not Greater than Necessary" to Effect the Purposes of Sentencing.**

As the government has said, in fashioning an appropriate sentence, a defendant's individual conduct must be assessed "on a spectrum." Government's Sentencing Memorandum, *United States v. Pert,* No. 21-cr-139-TNM (D.D.C.  12/13/21) [ECF No. 49] at 10.  In determining a fair and just sentence on this spectrum, the Court "should look to a number of critical factors," including:

(1) whether, when, and how the defendant entered the Capitol building;

(2) whether the defendant encouraged violence;

(3) whether the defendant encouraged property destruction;

(4) the defendant's reaction to acts of violence or destruction;

(5) whether during or after the riot, the defendant destroyed evidence;

(6) the length of the defendant's time inside of the building, and exactly where the defendant traveled;

(7) the defendant's statements in person or on social media;

(8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and

(9) whether the defendant demonstrated sincere remorse or contrition.

*Id.* Application of these factors in this case places Mr. Vargas' conduct at a point on that spectrum that calls for a sentence of probation.

With respect to factor 1, Mr. Vargas did not plan to go to the Capitol on January 6, 2021, and did not even approach a door for two hours after arriving there. Then, although he had he texted that he was "about to go in" as he approached the building, he stopped when he saw law enforcement officers attempting to bar entry, and moved out of the doorway and behind one of the doors, until the surge of the crowd pushed him in.

With respect to factors 2, 3 and 4, Mr. Vargas did not encourage violence or property destruction. In fact, when he saw a protester injured by a rubber bullet, he attempted to ameliorate the situation and diffuse any potential violence. *See* Defense Exhs. 201, 202, & 204. He spoke to police to assist. Throughout the day there is no evidence that Mr. Vargas spoke disrespectfully to any police officer or any other person.

With respect to factor 5, there is no evidence that he destroyed evidence to impede investigation, and when he was interviewed by FBI agents several weeks after January 6, 2021, he freely admitted to his conduct on that day.

With respect to factor 6, Mr. Vargas was in the Capitol for only about 7 minutes, during which time he moved with the crowd into the Rotunda, much of the time with his hands in the air in submission. He followed the instructions of law enforcement officers to remain in a designated area, properly waited while the police determined a path, and then immediately moved in a straight line to the exit when directed to.

With respect to factor 7, Mr. Vargas made no significant statements while in the Capitol building. He did later post a video claiming to have "t[aken] over" the Capitol, but this was bravado, rather than an accurate report of his conduct.

With respect to factor 8, Mr. Vargas stood where police told him to, often with his hands up in submission, and with no attempt to challenge a command.[1] He left when and where police asked him to and with his hands up. As mentioned earlier, he sought to work with police concerning an injured party.

With respect to factor 9, Mr. Vargas regrets his actions and presence in the Capitol that day. He understands the profound impact of the day and the role his actions played. He understands that his initial braggadocio was simply incorrect in context. He has also come to understand that his messaging habits were, and have been, a problem for him that he must bring under control. He frequently bragged in messages that he did things that were just not true, and he now understands that this behavior encourages similar behavior in others and is destructive.

1. **A Sentence of Probation Would Reflect the Seriousness of The Crime, Promote Respect for the Law, and Provide Just Punishment for the Offense.**

Mr. Vargas did not plan to enter the Capitol on January 6, 2021, and certainly would not do so today. He regrets his actions that day. However, he recognizes that his presence in

---

[1] The government has asserted that when a law enforcement officer "ordered Vargas to get on the ground[,] Vargas ignored this command." Letter of Kyle Mirabelli to Robert Walters, Exh. A to Defendant's Objections to Draft Presentence Investigation Report (Mar. 3, 2023) [ECF No. 78-1] at 3. However, as the video evidence shows, the scene in the Rotunda was noisy and confused. Moreover, as the government recognizes, the officer in question did not repeat the order when Mr. Vargas "ignored" it, but released his grip. *Id.* Mr. Vargas left the building almost immediately thereafter.

the Capitol was improper, and that he contributed to the destructive turmoil that occurred that day.

In crafting a sentence that reflects the seriousness of his actions, promotes respect for the law, and provides just punishment for his offense, the Court should bear in mind that his acts were not premeditated. He did not come to Washington that day with any plan to go near the Capitol, and in fact, his actions at the moment of his entry into the building betray, if not a firm desire to remain outside it, at least profound ambivalence. Moreover, once inside, Mr. Vargas simply moved with the crowd, and followed police instructions until he left the building a few minutes later. He did not interfere with or harm anyone, and did not take or damage any property. He did not say anything disrespectful or impolite to anyone in the Capitol, nor did he chant or yell anything while in the building. Other January 6 defendants who engaged in similar conduct have received sentences of probation.

On January 6, 2021, Rachael Pert traveled from Florida to D.C. "specifically for [the purpose of] entering the U.S. Capitol building: stopping the certification of the electoral college vote." Government's Sentencing Memorandum, *United States v. Pert,* No. 21-cr-139-TNM (D.D.C. 12/13/21) [ECF No. 49] at 2. She entered the Capitol Building "shortly after the initial breach," and remained there for 35 minutes, traveling to "multiple portions of the building," including the Rotunda and Statuary Hall. *Id.* at 4, 11. "When confronted by law enforcement inside the building, who were attempting to prevent a further breach of the building, [Ms. Pert] persisted." *Id.* at 11.

On these facts, the government requested a sentence of 3 months' home confinement, 24 months' probation, and 40 hours of community service. *Id.* at 1. The court sentenced Ms. Pert to 24 months' probation and 100 hours of community service. Judgment, *United States v. Pert,* No. 21-cr-139-TNM (D.D.C. 12/21/21) [ECF No. 59] at 2, 5.

In the weeks before January 6, 2021, James Allen Mels "sent out text messages glorifying political violence and foretelling 'hangings,' 'execution[s],' and 'gitmo,' among other incendiary statements, in connection with January 6.[2]   Government's Sentencing Memorandum, *United States v. Mels,* No. 21-cr-184-BAH (D.D.C.  10/5/22) [ECF No. 77] at 1. On January 6, "as he prepared to enter the Capitol building, Mels stood immediately outside the Senate Wing Door for several minutes, as United States Capitol Police officers were struggling to contain the rioters a few feet in front of him … [and] despite the mayhem around him, … entered the Capitol building less than one minute after other rioters violently overran a line of Capitol Police officers." *Id.* at 1-2.  Once inside the Capitol building, Mels "harangued a Capitol Police lieutenant, waving a booklet close to the officer's face and diverting the officer's attention as the Capitol breach was unfolding." *Id.*  After spending approximately 10 minutes near the door, Mels "continued deeper into the Capitol building, marching through the Crypt, by the Memorial Door, and through the Hall of Columns, before exiting the building through the South Door." *Id.* at 2.

On these facts, the government proposed a sentence of 30 days' imprisonment and 60 hours of community service. *Id.* at 1.  The court, however, sentenced him to 36 months' probation, including 90 days of home confinement. Judgment, *United States v. Mels,* No. 21-cr-184-BAH (D.D.C.  10/28/22) [ECF No. 85] at 2, 5.

When he came to Washington on January 6, 2021, James Wayne Brooks brought tear gas, a camouflage body armor vest, and a two-way radio.  Government's Sentencing Memorandum, *United States v. Brooks,* No. 22-cr-18-JMC (D.D.C.  10/22/22) [ECF No. 31] at

---

[2] Mels' texts including one threatening beheadings for treason, and asking "[w]hat do you think about that, congress?" and one stating that he intended to bring a firearm to Washington on January 6.  Government's Sentencing Memorandum, *United States v. Mels,* No. 21-cr-184-BAH (D.D.C.  10/5/22) [ECF No. 77] at 4.

11

2. He joined a group making its way toward the Upper West Terrace, waving a South Carolina flag. *Id.* at 4. He entered the Capitol and walked around for 10 minutes, and after leaving, stood in front of a police line shouting:

> You took an oath like I did, so did you, every one of you! What are you doing?! Help us make this a better fucking place! All you gotta do, is do the right thing! That's all I'm asking! Do the right thing!

*Id.* at 7.

Mr. Mels pled guilty to violating 18 U.S.C. § 1752(a)(1), and the government proposed a sentence of 3 months' imprisonment. *Id.* at 1. The court, however, sentenced him to 12 months' probation, and 60 hours of community service. Judgment, *United States v. Brooks*, No. 22-cr-18-JMC (D.D.C. 11/03/22) [ECF No. 40] at 2, 5.

Hector Vargas' conduct on January 6, 2021, was similar to, or even less blameworthy than, that of the defendants in these cases, which demonstrate that a sentence of probation reflects the seriousness of that conduct and is just.

### 2. A Sentence of Probation Would Afford Adequate Deterrence to Criminal Conduct, and Would Protect the Public.

It is difficult to imagine the unique circumstances of January 6, 2021, occurring again, which complicates the analysis of deterrence and protection of the public. However, Mr. Vargas came to Washington that day with no plan to enter or even go near the Capitol, and went there only on the express command of the then-President. Were a similar event to occur in the future, Mr. Vargas certainly would not attend, and his convictions will certainly deter others from similar conduct, whatever punishment he receives.

### 3. A Sentence of Probation Would Provide Mr. Vargas with Correctional Treatment in the Most Effective Manner.

As discussed above, Hector Vargas is a Marine Corps veteran who has struggled in the past few years to find his path in life. It is only in the past several months that he has

established a tenuous foothold, with full-time employment that allows him to have a fixed place to live and to meet his obligations, including those to his young daughter. A sentence of imprisonment – no matter how short – would obliterate his efforts, and jeopardize his ability to become a fully contributing and productive member of society. Therefore, Mr. Vargas respectfully submits that the most effective correctional treatment in this case requires a non-incarceratory sentence.

## CONCLUSION

For all the foregoing reasons, Mr. Vargas respectfully submits that a term of probation is the appropriate sentence in this case.

Dated: March 16, 2023                    Respectfully submitted,


  /s/ Paul F. Enzinna
D.C. Bar No. 421819
Ellerman Enzinna Levy PLLC
1050 30th Street, NW
Washington, DC 20007
202.753.5553
penzinna@eellaw.com


Nandan Kenkeremath
D.C. Bar 384732
USDC DC 384732
2707 Fairview Court
Alexandria, Virginia 22311
703-407-9407

*Counsel for Defendant Hector Vargas*

## CERTIFICATE OF SERVICE

I certify that on March 16, 2023, a copy of the foregoing Defendant's Memorandum in Aid of Sentencing was filed using the CM/ECF system, which will then send notification of such filing to all counsel of record.

Dated:   March 16, 2023                     Respectfully submitted,

   /s/ Paul F. Enzinna
Ellerman Enzinna Levy PLLC
1050 30th Street, NW
Washington, DC 20007
202.753.5553
penzinna@eellaw.com

*Counsel for Defendant Hector Vargas*